## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **AMERICAN NURSES ASSOCIATION** <br> 8515 Georgia Avenue, Suite 400, Silver Spring, MD 20910, <br> **CHESAPEAKE BAY FOUNDATION, INC.** <br> 6 Herndon Avenue, Annapolis, MD 21403, <br> **CONSERVATION LAW FOUNDATION** <br> 77 Summer Street, Boston, MA 02110, <br> **ENVIRONMENT AMERICA** <br> 44 Winter Street, 4th Floor, Boston, MA 02108, <br> **ENVIRONMENTAL DEFENSE FUND** <br> 257 Park Avenue South, New York, NY 10010, <br> **IZAAK WALTON LEAGUE OF AMERICA** <br> 707 Conservation Lane, Gaithersburg, MD 20878, <br> **NATURAL RESOURCES COUNCIL OF MAINE** <br> 3 Wade Street, Augusta, ME 04330, <br> **NATURAL RESOURCES DEFENSE COUNSEL** <br> 40 West 20th Street, New York, NY 10011, <br> **PHYSICIANS FOR SOCIAL RESPONSIBILITY** <br> 1875 Connecticut Avenue, NW, Suite 1012, <br> Washington, DC 20009, <br> **SIERRA CLUB** <br> 85 Second Street, 2d floor, San Francisco, CA 94105, <br> **THE OHIO ENVIRONMENTAL COUNCIL** <br> 1207 Grandview Avenue, Suite 201, Columbus, OH 43212, <br> and <br> **WATERKEEPER ALLIANCE, INC.** <br> 50 South Buckhout, Suite 302, Irvington, NY 10533, <br><br> Plaintiffs, <br><br> v. <br><br> **STEPHEN L. JOHNSON, Administrator** <br> United States Environmental Protection Agency, and <br><br> **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**, <br><br> Defendants. | Civ. Action No. 08- |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Stephen L. Johnson ("Administrator"), the Administrator of the United States Environmental Protection Agency ("U.S. EPA" or "EPA"), has failed to timely perform a nondiscretionary duty under § 112(c)(5) of the Clean Air Act ("the Act"), 42 U.S.C. § 7412(c)(5). In particular, the Administrator has failed to promulgate by December 20, 2002, final national emissions standards under § 112(d) of the Act for the hazardous air pollutants ("HAPs") emitted by new and existing coal- and oil-fired electric utility steam generating units ("EGUs"). The Administrator's nondiscretionary duty arose because EPA listed EGUs as an industrial source category under §112(c) of the Act.

2. Had the Administrator timely promulgated final national emissions standards on December 20, 2002, EGUs constructed or reconstructed after that date would have had to comply with those standards. 42 U.S.C. § 7412(i)(1). Existing EGUs would have had to comply as expeditiously as practicable, but in no event later than December 20, 2005. 42 U.S.C. § 7412(i)(3).

3. In this action, plaintiffs seek to compel defendants to promulgate final emissions standards requiring the maximum degree of reduction in emissions of the HAPs emitted by EGUs, pursuant to § 112(d) of the Act. Plaintiffs also seek a mandatory and enforceable schedule for the Administrator to expeditiously promulgate such standards and to publish them in the Federal Register.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2), as well as 28 U.S.C. §§ 1331 and 1361, and may issue a declaratory judgment and grant further relief pursuant to § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2), and

28 U.S.C. §§ 2201 and 2202.  Plaintiffs have the right to bring this action pursuant to § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2).

5.  Venue for this action lies in this District Court pursuant to § 304(a) of the Act, 42 U.S.C. § 7604(a)(2) (final paragraph), and 28 U.S.C. §§ 1391 (b) and (e).

6.  On October 10, 2008, plaintiffs sent a certified letter to the Administrator notifying him of his failure to timely perform his nondiscretionary duty described above, and of plaintiffs' intent to sue, in accordance with § 304(b)(2) of the Act, 42 U.S.C. § 7604(b)(2), and 40 C.F.R. Part 54.

## PARTIES

7.   Plaintiff American Nurses Association ("ANA") is a nonprofit corporation organized and existing under the laws of the District of Columbia.  ANA's more than 150,000 members are registered nurses, who also are members of its 54 constituent member associations, located throughout the United States.  ANA and its members are dedicated to promoting the health, safety, and well-being of individuals and communities.  To promote its associational goals and the goals of its members, ANA has actively participated in proceedings to strengthen and enforce regulations that affect public health and environmental standards throughout the United States.  In particular, ANA has been a party to proceedings to promote, strengthen, and enforce health care standards that address the health, safety, and well-being of infants, children, adolescents, and young adults.

8.  Plaintiff Chesapeake Bay Foundation ("CBF"), a corporation organized and existing under the laws of the State of Maryland,  is a regional, nonprofit, nonpartisan, public-interest advocacy organization with approximately 200,000 members living throughout the Chesapeake Bay region (Maryland, Pennsylvania, New York, Virginia, and West Virginia).

CBF is the only independent organization dedicated solely to restoring and protecting the Chesapeake Bay and its tributary rivers.  CBF's goal is to improve water quality by reducing pollution emissions to the Chesapeake Bay, including reducing the atmospheric deposition of air toxics, including mercury and nickel, from coal- and oil-fired EGUs.  CBF owns facilities and operates educational and restoration programs that are adversely affected by the air toxics emitted by coal- and oil-fired EGUs.

9. Plaintiff Conservation Law Foundation ("CLF"), a corporation organized and existing under the laws of the Commonwealth of Massachusetts, is a regional, nonprofit, nonpartisan, member-supported environmental advocacy organization with approximately 3,350 members living in the six state New England region.  CLF's work in four program areas – Clean Energy & Climate Change, Clean Water & Healthy Forests, Healthy Oceans & Healthy Communities, and Environmental Justice – protects New England's people, natural resources, and communities.

10. Plaintiff Environment America ("EA"), a corporation organized and existing under the laws of the State of Colorado, is a federation of state-based, member-funded environmental advocacy organizations, with a combined membership of over 500,000 persons. EA's mission is to protect America's air, water, and open spaces.  EA represents the interests of its state organizations and their members by bringing actions to enforce the federal environmental laws, including the Clean Air Act.  EA has been an active voice seeking deep reductions in air pollutant emissions from the nation's power plants for over a decade, through its predecessor organization the U.S. Public Interest Research Group, and its state affiliate groups.

11. Plaintiff Environmental Defense Fund ("EDF"), a corporation organized and existing under the laws of the State of New York, protects and enhances the natural environment by linking science, economics, and law to create innovative, equitable, and cost-effective solutions to the most urgent environmental problems. Among other activities to advance this mission on behalf of its more than 300,000 members nationwide, EDF participates in litigation to enforce environmental laws, including air quality-related litigation under the Clean Air Act.

12. Plaintiff Izaak Walton League of America ("IWLA"), a corporation organized and existing under the laws of the State of Illinois, is a national not-for-profit membership organization, with 36,000 members, 20 state divisions and 270 local chapters. IWLA is dedicated to protecting our nation's soil, air, woods, waters, and wildlife, to ensure a high quality of life for all people, now and in the future. IWLA has worked on clean air issues for over 25 years, representing its members' concerns regarding, among other issues, mercury deposition and contamination from power plant air emissions.

13. Plaintiff Natural Resources Council of Maine ("NRCM"), a corporation organized and existing under the laws of the State of Maine, is a nonprofit membership organization dedicated to preserving the quality of the air, water, forests, and other natural resources of the state of Maine, for the benefit of present and future generations. NRCM has 8,000 members and supporters. NRCM works through legislative and legal advocacy efforts to control toxic pollution, including mercury air emissions, from a broad range of sources.

14. Plaintiff Natural Resources Defense Council ("NRDC"), a corporation organized and existing under the laws of the State of New York, is a nonprofit membership organization of over 429,000 members nationwide. NRDC works to protect wildlife and wild places and to

ensure a healthy environment for all life on earth, by actively participating in proceedings to strengthen and enforce the environmental laws of the United States.

15. Plaintiff Physicians for Social Responsibility ("PSR"), a corporation organized and existing under the laws of the Commonwealth of Massachusetts, is a national nonprofit membership organization with approximately 31,000 members in 32 affiliated state and local chapters and 72 medical student chapters located in all 50 states. PSR's members are medical and public healthcare professionals, and lay advocates. Among its goals, PSR is dedicated to promoting and strengthening public health generally, and the health, safety, and well-being of infants, children, adolescents, and young adults specifically. To advance its associational goals and the individual and professional goals of its members, PSR actively participates in proceedings to strengthen and enforce air quality and public health standards throughout the United States, including proceedings to enforce the Clean Air Act.

16. Plaintiff Sierra Club, a corporation organized and existing under the laws of the State of California, is a nonprofit membership organization dedicated to promoting the responsible use of the earth's ecosystems and resources. Sierra Club, on behalf of its over 750,000 members nationwide, seeks the enforcement of the nation's environmental laws, in furtherance of its goal to enlist humanity to protect and restore the quality of the natural and human environment and to use all lawful means to carry out these objectives.

17. Plaintiff The Ohio Environmental Council ("OEC"), a corporation organized and existing under the laws of the State of Ohio, is a nonprofit membership organization dedicated to informing, uniting, and empowering Ohio citizens to protect the environment and conserve natural resources. OEC works on behalf of its more than 2400 members to reduce Ohioans'

6

exposure to harmful pollution, including the hazardous air pollutants emitted by the many coal-fired power plants in and near Ohio.

18. Plaintiff Waterkeeper Alliance ("Waterkeeper"), a corporation organized and existing under the laws of the State of New York, is an umbrella organization representing and protecting the interests of over 180 Riverkeeper, Baykeeper, Coastkeeper, Soundkeeper and other Waterkeeper programs in North America and around the world. Waterkeeper also supports and connects its community-based membership conservation programs and provides a voice for its over 15,000 individual members nationwide, who use, recreate, and otherwise depend on local waterways and the fish that live in them. The mission of the Waterkeeper Alliance involves protecting its members' commercial, recreational, aesthetic and conservation interests in clean water and uncontaminated fish, including seeking limits on the atmospheric deposition into the nation's waterways of HAPs emitted by coal- and oil-fired EGUs.

19. Plaintiffs are "persons" within the meaning of § 302(e) of the Act, 42 U.S.C. §7602(e), who may commence a civil action under § 304(a) of the Act, 42 U.S.C. § 7604(a). Plaintiff organizations sue on behalf of themselves and their individual members, including their members who live, work, travel, or recreate in the vicinity of or downwind from EGUs, who are exposed to the HAPs emitted by such EGUs and to the health risks associated with such exposure, or who consume fish contaminated by the mercury emitted from such EGUs or who would consume fish were they not contaminated.

20. Plaintiffs' members live, work, travel or recreate in one or more of the fifty States and one U.S. territory for which fish consumption advisories have been issued by state governments, warning women of child-bearing age (15-49 years old) and young children to limit their intake of freshwater and saltwater fish because of the likelihood that they are

contaminated with mercury.

21. Plaintiffs' members include women of child-bearing age, or the spouses of women of child-bearing age, or the parents of children ages 14 and under, who seek for themselves and their children the dietary variety and nutritional value obtained by consuming uncontaminated freshwater and saltwater fish.

22. Plaintiffs' members include women of child-bearing age, or the spouses of women of child-bearing age, or the parents of children ages 14 and under, who are anglers who wish to consume the freshwater and saltwater fish they catch, including fish caught in waters of states for which fishing advisories have been posted.

23. Plaintiffs' members include adult persons whose cardiovascular health is threatened by eating mercury-contaminated freshwater and saltwater fish.

24. Plaintiffs' members include health professionals who, on a daily basis, care for patients, including infants and young children, whose health and healthy development is threatened by the harmful health effects of mercury pollution.

25. Plaintiffs' members include wildlife enthusiasts who wish to enjoy observing populations of loons and other wildlife whose survival is threatened by mercury contamination.

26. Defendant Stephen L. Johnson is the Administrator of the United States EPA, within the meaning of § 302(a) of the Act, 42 U.S.C. § 7602(a), against whom any person may commence a civil action under § 304(a) of the Act, 42 U.S.C. § 7604(a), where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator. The Administrator has been authorized by Congress to prescribe such regulations as are necessary to carry out his duties under the Act, 42 U.S.C. § 7601(a)(1), including the duty to promulgate final emissions standards under § 112(d) of the Act

for industrial categories listed under § 112(c) of the Act, which include, since December 20, 2000, EGUs.

27.     Defendant United States EPA is the federal agency charged with implementation of the Clean Air Act.

## STATUTORY AND FACTUAL BACKGROUND

28.     In 1990, Congress established a detailed statutory scheme for the regulation of emissions of 188 listed HAPs from stationary sources. *See* 42 U.S.C. § 7412. Congress directed EPA to publish a list of "all categories and subcategories of major sources and area sources" that emit the listed HAPs. 42 U.S.C. § 7412(c). Congress furthermore directed EPA to promulgate rules that require the maximum achievable reduction in emissions of the listed HAPs for each of the listed categories or subcategories of sources. 42 U.S.C. §§ 7412(d)(1)-(3),(e)(1). These rules are known as "Maximum Achievable Control Technology" or "MACT" standards.

29.     The hazardous air pollutants listed by Congress in § 112(b) of the Act, including mercury, "present a threat of adverse human health effects . . . or adverse environmental effects." 42 U.S.C. § 7412(b)(2); *see also* 61 Fed. Reg. 68,384 (Dec. 27, 1996) (interpreting that statutory definition to include pollutants "known or suspected [to] caus[e] cancer, nervous system damage, birth defects or other serious health effects.").

30.     In 1990, Congress mandated the completion of a study of the public health hazards reasonably anticipated to result from emissions of all the HAPs emitted by EGUs, and directed the Administrator to determine whether regulation of EGUs under § 112 is appropriate and necessary. 42 U.S.C. § 7412(n)(1)(A).

31.     According to the "Utility Air Toxics Report to Congress," prepared by EPA in

February 1998 pursuant to § 112(n)(1)(A) of the Act, coal- and oil-fired EGUs emit 67 of the 188 HAPs listed in §112(b) of the Act, including arsenic, dioxins, nickel, chromium, and mercury. Of the HAPs emitted by coal-fired EGUs, EPA in 1998 identified mercury as the HAP of greatest potential public health concern. EPA identified nickel as the HAP of greatest potential concern from oil-fired EGUs.

32. EPA's 1999 "National Emissions Inventory" reports that coal-fired EGUs emit about forty-one percent of all anthropogenic mercury air emissions in the United States, making them the largest U.S. source category of mercury air emissions.

33. According to EPA, a significant percentage of the mercury emitted from coal-fired EGUs is deposited onto land or water bodies, where the chemical form of some amount of the deposited mercury changes (through a methylation process) into methylmercury. Methylmercury is a highly toxic form of mercury that bioconcentrates, or accumulates, in the aquatic food web. It is taken in by microscopic animals or plants, which are in turn eaten by larger aquatic animals, which are themselves then eaten. Because the rate at which methylmercury is ingested by fish is much faster than the very slow rate at which it is eliminated, larger fish can accumulate significant amounts of methylmercury in their tissues.

34. Water fowl, including, for example, loons, eat the contaminated fish, and the methylmercury accumulates in their tissues as well, causing adverse effects, including lowered fertility and negative growth rates in significant percentages of the population living on and near contaminated waters.

35. Eating contaminated fish is the primary way that humans and wildlife are exposed to methylmercury. To date, all fifty states and one U.S. territory have issued fish advisories warning women of childbearing age and, in many cases, young children, against

consuming freshwater and saltwater fish caught in some or all of the water bodies within the state. Even where people are aware of such advisories, recent studies indicate they may continue to eat or share with others contaminated fish, either for cultural reasons, reasons of economic necessity, or for other reasons.

36. Once consumed, methylmercury remains in the human body for an extended period of time, 140-160 days on average.

37. In 2000, the National Research Council of the National Academy of Sciences described the potential adverse human health effects of consuming methylmercury (either directly, or in the case of a developing fetus, through the mother's blood supply) in amounts above the reference dose (a safe consumption level of 0.1 micrograms per kilogram of body weight per day). These effects include neurological and developmental problems such as poor attention span and delayed language development, impaired memory and vision, problems processing information, and impaired fine motor coordination. Because a developing fetus is the most sensitive to the adverse effects of exposure to methylmercury, which is distributed in the mother's blood supply and passes through the placenta, women of child-bearing age are a population of most concern. Additionally, because children's brain development continues after birth until age 14, young children are also a population of concern.

38. In 2003, the United States Centers for Disease Control estimated that 1 in 12 women of childbearing age (about eight percent) have unsafe levels of mercury in their blood. EPA released a re-analysis of this data in February 2004 estimating that as many as 630,000 children may be born each year with unhealthy levels of mercury in their blood (i.e., at or above 5.8 micrograms per liter of blood).

39. Recent studies indicate that regulating industrial sources of HAP emissions, including mercury, to require the maximum degree of reductions in HAP emissions is linked to significantly less mercury deposition in areas near the regulated sources, and significantly lower methylmercury concentrations in fish and other wildlife in areas near the regulated sources. For example, in South Florida, mercury emissions from incinerators have declined ninety-five percent since the early 1990s because the state imposed stringent limits on mercury air emissions from these sources. These emissions reductions in turn have led to a significant decline in mercury deposition. A measured decline of sixty percent in the methylmercury concentrations in large, predator fish and wading birds, over a four-year period after the regulations were in effect, is attributable to the decline in mercury emissions.

40. On December 20, 2000, then-EPA Administrator Carol Browner published "Regulatory Finding on the Emissions of Hazardous Air Pollutants From Electric Utility Steam Generating Units," 65 Fed. Reg. 79,825 (December 20, 2000) ("Regulatory Finding and Listing Decision"). Administrator Browner made the Regulatory Finding and Listing Decision based on the 1998 Utility Air Toxics Report to Congress, EPA's 1997 "Mercury Study Report to Congress," prepared pursuant to § 112(n)(1)(B) of the Act, and additional scientific and technical information obtained by the Administrator subsequent to the completion and publication of the 1998 Utility Air Toxics Report to Congress.

41. In the Regulatory Finding and Listing Decision, Administrator Browner found that EGUs emit a significant number of the 188 HAPs listed in § 112(b) of the Act, including mercury, which she found was the HAP of greatest concern. The Administrator also expressed potential concern about other HAPs, including arsenic, chromium, nickel, and cadmium, which are of potential concern for carcinogenic effects, and dioxins, hydrogen chloride, and hydrogen

flouride, which are of potential public health concern. 65 Fed. Reg. 79,825, 79,827.

42. In the Regulatory Finding and Listing Decision, Administrator Browner found that regulating "HAP emissions from coal- and oil-fired electric utility steam generating units under section 112 [of the Clean Air Act] is appropriate and necessary"; and she "add[ed] coal- and oil-fired electric utility steam generating units to the list of source categories under section 112(c) of the CAA." 65 Fed. Reg. 79,825, 79,830 & 79,831.

43. Once a source category is listed under § 112(c), the Administrator "shall" promulgate regulations for that source category under § 112(d) of the Act. 42 U.S.C. §§ 7412(c)(2), 7412(c)(5). Regulations promulgated under § 112(d) are national in scope and applicable to new and existing sources of HAPs in the listed category, and require the "maximum degree of reduction in emissions of the hazardous air pollutants . . . that the Administrator . . . determines is achievable" taking into account various factors listed in the statute. 42 U.S.C. § 7412 (d)(2) ("MACT standards"). In no case can such MACT standards for new sources be less stringent than "the emission control that is achieved in practice by the best controlled similar source"; for existing sources, the MACT standards must be at least as stringent as "the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information) . . . ." 42 U.S.C. § 7412(d)(3).

44. Section 112(c)(5) of the Act, 42 U.S.C. § 7412(c)(5), states that "[i]n the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emissions standards under subsection (d) of this section shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category is listed, whichever is later."

45. The date "10 years after November 15, 1990," was December 15, 2000. The date

"2 years after the date on which [the coal- and oil-fired electric utility steam generating units] category is listed" was December 20, 2002. Both dates have passed.

47. In March, 2005, Administrator Johnson did finalize and promulgate a rule purporting to remove EGUs from the list of industries for which MACT standards must be promulgated under section 112. "Revision of December 2000 Regulatory Finding on the Emissions of Hazardous Air Pollutants from Electric Utility Steam Generating Units From the Section 112(c) List," 70 Fed. Reg. 15,994 (March 29, 2005), amended and corrected in 70 Fed. Reg. 33,000 (June 7, 2005) ("Delisting Rule"). Administrator Johnson also finalized a rule establishing a cap and trade program for mercury from coal-fired EGUs only. "Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units," 70 Fed. Reg. 28,606 (May 18, 2005) ("CAMR").

48. On April 28, 2004, certain parties, including several of the plaintiffs, filed suit in this Court seeking to enforce the statutory deadlines for EPA action to promulgate a MACT standard for EGUs. That case was dismissed in October 2005, *Izaak Walton League of America, et al. v. EPA*, 400 F.Supp. 2d 38 (D.D.C. 2006), because by that date, EPA had taken final action in issuing the Delisting Rule and CAMR, and therefore, jurisdiction over the matter rested at that point with the U.S. Court of Appeals for the District of Columbia Circuit. The District Court stated, "[i]f the Court of Appeals finds either that the EPA did improperly delist [EGUs] or that the EPA should not have delisted [EGUs], the EPA's nondiscretionary duty will be reinstated making appropriate an action brought here to order the EPA to fulfill its nondiscretionary duty." *Id.* at 44.

49. Both the Delisting Rule and CAMR have now been vacated by the U.S. Court of Appeals for the District of Columbia Circuit. *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir.),

*mandate issued,* March 14, 2008, *reh'g and reh'g en banc denied,* May 20,2008, *petitions for cert. filed,* Sept. 17, 2008 and Oct. 17, 2008 (Nos. 08- 512 and 08- 352). In its decision, the Court noted: "EPA thus concedes that if EGUs *remain listed under section 112*, as we hold," *id.* at 583 (emphasis added), then the CAMR regulations for existing sources and the NSPS must also fall.

50. To date, the Administrator has neither finalized, promulgated nor published in the Federal Register any final national emissions standards under § 112(d) for EGUs, as mandated by §112(c)(5) of the Act, 42 U.S.C. § 7412(c)(5). As described above, the statutory timeframe for promulgating such final emissions standards has expired.

51. Section 112(i)(1) of the Act, 42 U.S.C. §7412(i)(1), states that no source can be constructed or reconstructed after the effective date of a § 112(d) MACT standard unless the Administrator (or a State with an approved permit program) determines that the source will comply with the standard. For new EGUs, therefore, the presumptive deadline for compliance with a MACT standard under the timetable established by the Act would have been on the effective date of the MACT regulations, which were required to be promulgated on December 20, 2002, as set forth above. Section 112(i)(3) of the Act, 42 U.S.C. § 7412(i)(3), presumptively requires existing sources to be in compliance with a final promulgated MACT standard "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard . . . ." For existing EGUs, the presumptive deadline for compliance under the timetable established by the Act would have been as expeditiously as practicable, but in no event later than December 20, 2005.

52. For the foregoing reasons the failures of the Administrator challenged herein cause injury to plaintiffs and their many members.

## CLAIM FOR RELIEF

**(Failure to Perform Nondiscretionary Act or Duty Violates the Clean Air Act)**

53. The allegations of all preceding paragraphs are hereby incorporated as if fully set forth herein.

54. The Administrator's failure to promulgate on or before December 20, 2002, final emissions standards under § 112(d) of the Act for new and existing coal- and oil-fired EGUs requiring the maximum degree of reduction in emissions of the hazardous air pollutants subject to § 112 of the Clean Air Act, as mandated by § 112(c)(5), and his continuing failure to promulgate such standards, constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with the Administrator within the meaning of § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2).

## REQUEST FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that this Court do each of the following:

(1) Declare that the Administrator's failure to promulgate on or before December 20, 2002, final emissions standards under § 112(d) of the Act for new and existing coal- and oil-fired EGUs requiring the maximum degree of reduction in emissions of the hazardous air pollutants subject to § 112 of the Clean Air Act constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with the Administrator within the meaning of Clean Air Act § 304(a)(2), 42 U.S.C. § 7604(a)(2).

(2) Order the EPA Administrator to expeditiously propose, by a date certain but no later than December 20, 2009, and finalize, by a date certain but no later than December 20, 2010, emissions standards under § 112(d) of the Act for new and existing coal- and oil-fired EGUs,

requiring the maximum degree of reduction in emissions of the hazardous air pollutants subject to § 112 of the Clean Air Act, and to cause that final rule to be published in the Federal Register.

(3) Retain jurisdiction of this action to ensure compliance with this Court's decree.

(4) Award plaintiffs the costs of this action, including, *inter alia*, attorney fees, under 42 U.S.C. § 7604(d), 28 U.S.C. § 2412(d), or both.

(5) Grant such other relief as this Court deems just and proper.

DATED: December 18, 2008

_____
James S. Pew (D.C. Bar No. 448830)
**Counsel of Record for Plaintiffs**
Earthjustice
1625 Massachusetts Avenue, NW
Suite 702
Washington, DC 20036-2212
(202) 667-4500 (phone)

*Attorney for Environmental Defense Fund,
Natural Resources Defense Council,
and Sierra Club*

_____
Ann Brewster Weeks (by JSP)
(*Pro hac vice* Motion filed and pending)
Clean Air Task Force
18 Tremont Street
Suite 530
Boston, MA 02108
(617) 624-0234 (phone)

*Attorney for Conservation Law
Foundation, Environment America,
Izaak Walton League of America,
Natural Resources Council of Maine,
and The Ohio Environmental Council*

_Scott A. Edwards_ (by JSP)

Scott A. Edwards
Waterkeeper Alliance, Inc.
50 South Buckhout Street
Suite 302
Irvington, NY 10533
(914) 674-0622

*Attorney for Waterkeeper Alliance, Inc.*

_John T. Suttles, Jr._ (by JSP)

John T. Suttles, Jr. (*Pro hac vice* Motion filed and pending)
Southern Environmental Law Center
200 West Franklin Street, Suite 330
Chapel Hill, NC 27516
(919) 967-1450

*Attorney for American Nurses Association and Physicians for Social Responsibility*

_Jon A. Mueller_ (by JSP)

Jon A. Mueller
Chesapeake Bay Foundation, Inc.
6 Herndon Avenue
Annapolis, MD 21403
(410) 268-8816

*Attorney for Chesapeake Bay Foundation, Inc.*